**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff, FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MANUEL MARQUINA,
     a/k/a/ LUIS GARCIA
*on behalf of himself, FLSA Collective Plaintiffs, and the*
*Class,*

               Plaintiff,

       v.

STOUT NYC HOSPITALITY GROUP INC.
     f/k/a WHELAN BROTHERS MANAGEMENT
     GROUP, INC.,
AMITY STREET, INC.
     d/b/a AMITY HALL DOWNTOWN,
AMITY HALL UPTOWN INC.
     d/b/a AMITY HALL UPTOWN,
STOUT INC.
     d/b/a FEILE
     d/b/a STOUT NYC PENN STATION,
MAGGIE'S PLACE, INC.
     d/b/a MAGGIE'S PLACE,
RIVERCREST INC.
     d/b/a RIVERCREST,
STOUT II, INC.
     d/b/a STOUT NYC FINANCIAL DISTRICT,
STOUT III INC.
     d/b/a STOUT NYC GRAND CENTRAL,
STOUT BRYANT PARK, INC.
     d/b/a STOUT NYC BRYANT PARK,
STOUT MARKETS, INC.
     d/b/a STOUT NYC LODGE BAR,
HALF PINT ON THOMPSON, LLC
     d/b/a ERNIE'S BAR
     d/b/a THE HALF PINT,

Case No:

**CLASS AND COLLECTIVE**
**ACTION COMPLAINT**

1

THE INDEPENDENT NYC, INC.
      d/b/a THE INDEPENDENT,
THE LONG ROOM INC.
      d/b/a THE LONG ROOM,
THE WOLFE ON AMSTERDAM INC.
      d/b/a THE WOLFE, and
MARTIN P. WHELAN,

                Defendants.

---

Plaintiff, MANUEL MARQUINA ("Plaintiff"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Collective and Class Action Complaint against Defendants, STOUT NYC HOSPITALITY GROUP INC. f/k/a WHELAN BROTHERS MANAGEMENT GROUP, INC. ("Stout Hospitality"), AMITY STREET, INC. d/b/a AMITY HALL DOWNTOWN, AMITY HALL UPTOWN INC. d/b/a AMITY HALL UPTOWN, STOUT INC. d/b/a FEILE, d/b/a STOUT NYC PENN STATION, MAGGIE'S PLACE, INC. d/b/a MAGGIE'S PLACE, RIVERCREST INC. d/b/a RIVERCREST, STOUT II, INC. d/b/a STOUT NYC FINANCIAL DISTRICT, STOUT III INC. d/b/a STOUT NYC GRAND CENTRAL, STOUT BRYANT PARK, INC. d/b/a STOUT NYC BRYANT PARK, STOUT MARKETS, INC. d/b/a STOUT NYC LODGE BAR, HALF PINT ON THOMPSON, LLC d/b/a ERNIE'S BAR, d/b/a THE HALF PINT, THE INDEPENDENT NYC, INC. d/b/a THE INDEPENDENT, THE LONG ROOM INC. d/b/a THE LONG ROOM, THE WOLFE ON AMSTERDAM INC. d/b/a THE WOLFE, (collectively, the "Corporate Defendants"), and MARTIN P. WHELAN (the "Individual Defendant" and together with the Corporate Defendants, the "Defendants") and states as follows:

## **INTRODUCTION**

1.    Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that he and similarly situated individuals are entitled to recover from

Defendants: (1) unpaid wages, including overtime, due to an invalid tip credit policy, (2) liquidated damages, and (3) attorneys' fees and costs.

2.      Plaintiff alleges that, pursuant to the New York Labor Law ("NYLL"), he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, including overtime, due to an invalid tip credit policy, (2) unpaid uniform maintenance expenses, (3) unpaid spread of hour premiums, (4) liquidated damages, (5) statutory penalties due to WTPA violations, and (6) attorneys' fees and costs.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

4.      Venue is proper in the Southern District pursuant to 28 U.S.C. §1391, because the events giving rise to this Complaint took place in this District. The circumstances giving rise to this action occurred in whole or in part in the county in which this Court sits. Throughout his employment, Plaintiff worked for Defendants in Manhattan.

## PARTIES

*Plaintiff:*

5.      Plaintiff, for all relevant time periods, is and was a resident of Fairfield County, Connecticut.

*Corporate Defendants:*

6.      Corporate Defendant STOUT NYC HOSPITALITY GROUP INC. (f/k/a WHELAN BROTHERS MANAGEMENT GROUP, INC. prior to March 22, 2021), with and through its subsidiaries (all other Corporate Defendants), collectively owns and operates as a

joint enterprise, fifteen (15) restaurants under the ownership and management of Individual Defendant MARTIN P. WHELAN. These restaurants operate under the various trade names at the following addresses:

(a) Amity Hall Uptown: 982 Amsterdam Ave, New York, NY 10025;

(b) Amity Hall Downtown: 80 W 3rd St, New York, NY 10012;

(c) The Half Pint: 234 Thompson St, New York, NY 10012;

(d) Ernie's Bar: 76 W 3rd St, New York, NY 10012;

(e) Stout NYC Penn Station: 133 W 33rd St, New York NY 10001;

(f) Stout NYC Financial District: 90 John St, New York NY 10038;

(g) Stout NYC Grand Central: 60 E 41st St, New York, NY 10017;

(h) Stout NYC Bryant Park: 109 W 39th St, New York, NY 10018;

(i) Stout NYC Lodge Bar: Bryant Park's Winter Village, New York, NY 10018;

(j) The Independent: 147 W 40th St, New York, NY 10018;

(k) The Long Room: 120 W 44th St, New York, NY 10036;

(l) The Wolfe: 425 Amsterdam Ave, New York, NY 10024;

(m) Feile: 131 W 33rd St, New York NY 10001;

(n) Maggie's Place: 21 E 47th St, New York NY 10017; and

(o) Rivercrest: 33-15 Ditmars Blvd, New York NY 11105.

(together, the "Restaurants").

7.    Each Restaurant is owned and operated by Individual Defendant and Corporate Defendant Stout Hospitality. Each Restaurant is assigned a corporate entity to serve as nominal owner and operator:

- Corporate Defendant STOUT NYC HOSPITALITY GROUP INC. is a domestic business corporation organized under the laws of the State of New York, with a

principal place of business and an address for service of process located at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant AMITY STREET, INC. (d/b/a Amity Hall Downtown), is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 80 W 3rd St, New York, NY 10012, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant AMITY HALL UPTOWN INC. (d/b/a Amity Hall Uptown) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 982 Amsterdam Ave, New York, NY 10025 and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant STOUT INC. (d/b/a Feile and Stout NYC Penn Station) is a domestic business corporation organized under the laws of the State of New York with a principal place of business and service of process address both located at 133 West 33rd Street, New York, NY 10001.

- Corporate Defendant MAGGIE'S PLACE, INC. (d/b/a Maggie's Place) is a domestic business corporation organized under the laws of the State of New York with a principal place of business and service of process address both located at 21 E 47th Street, New York, NY 10017.

- Corporate Defendant RIVERCREST INC. (d/b/a Rivercrest) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 33-15 Ditmars Boulevard, Astoria, NY 11105, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant STOUT II, INC. (d/b/a Stout NYC Financial District) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 90 John Street, New York, NY 10038, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant STOUT III INC. (d/b/a Stout NYC Grand Central) is a domestic business corporation organized under the laws of the State of New York with a principal place of business and service of process address both located at 60 E 41st Street, New York, NY 10017.

- Corporate Defendant STOUT BRYANT PARK, INC. (d/b/a Stout NYC Bryant Park) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 109 W 39th Street, New York, NY 10018, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant STOUT MARKETS, INC. (d/b/a Stout NYC Lodge Bar) is a domestic business corporation organized under the laws of the State of New York with

a principal place of business at 42 W 42nd Street, New York, NY 10018, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant HALF PINT ON THOMPSON, LLC (d/b/a Ernie's Bar and The Half Pint) is a domestic limited liability company organized under the laws of the State of New York with a principal place of business at 234 Thompson St a/k/a/ 76 W 3rd St, New York, NY 10012, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant THE INDEPENDENT NYC, INC. (d/b/a The Independent) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 147 W 40th St, New York, NY 10018, and an address for service of process at 786 Walt Whitman Rd, Melville, NY 11747.

- Corporate Defendant THE LONG ROOM INC. (d/b/a The Long Room) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 120 W 44th St, New York, NY 10036, and an address for service of process at 234 Thompson Street, New York, NY 10012.

- Corporate Defendant THE WOLFE ON AMSTERDAM INC. (d/b/a The Wolfe) is a domestic business corporation organized under the laws of the State of New York with a principal place of business at 425 Amsterdam Avenue, New York, NY 10024, and an address for service of process at 21-45 44th Drive, Apt PHE, Long Island City, NY 11101.

*Individual Defendant:*

8.    Individual Defendant MARTIN P. WHELAN is an Owner, President and Operator of all Corporate Defendants. Individual Defendant MARTIN P. WHELAN is also the Chief Executive Officer of all Corporate Defendants. *See* **Exhibit A**.

9.    At all relevant times, Individual Defendant MARTIN P. WHELAN exercised control over the employment terms and conditions of Plaintiff, FLSA Collective Plaintiffs, and Class Members.

10.    At all relevant times, Individual Defendant MARTIN P. WHELAN had and exercised the power and authority to (i) employ and terminate employees and managers, (ii) determine their hourly rates or salaries, frequency of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly

affect the qualities of their employments, and (v) directly or indirectly maintained their employment records.

11.    At all relevant times, Individual Defendant MARTIN P. WHELAN, in his capacity as President of all Corporate Defendants, frequently visited each of the Restaurants to (i) inspect the operations and quality of food, service, and hygiene of the Restaurants, (ii) meet and confer with the Restaurants' General Managers  and other managers to discuss operations, sales, and overall status of the Restaurants and their employees, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) and managers and monitor their individual performances of duties and behaviors, and (v) directly or indirectly reprimand any employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

12.    At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members could each complain to Individual Defendant MARTIN P. WHELAN (via direct contact during his visits to their relevant Restaurants) directly regarding any of the terms of their employments, and Individual Defendant MARTIN P. WHELAN would have the authority to directly affect any changes to the quality and terms of their employments.

13.    At all relevant times, Individual Defendant MARTIN P. WHELAN exercised functional control over the business and financial operations of all Corporate Defendants.

14.    Individual Defendant MARTIN P. WHELAN was not at every Restaurant continuously but instead frequently made trips to the different restaurants to deliberate with managers and supervise employees.

15.     Individual Defendant MARTIN P. WHELAN would confer with managers and supervisors of each Restaurant to discuss things like revenues and employee scheduling, but he would also ask workers such as Plaintiff, FLSA Collective Plaintiffs, and Class Members how things were going and whether there should be any issues he should be concerned about.

16.     At all relevant times, Individual Defendant MARTIN P. WHELAN's role and decisions made in connection to his role directly affected the nature, conditions, and circumstances of Plaintiff's, FLSA Collective Plaintiffs', and Class Members' employments.

*Single Integrated Enterprise Allegations:*

17.     While each Restaurant is assigned a corporate entity, in reality, all the Restaurants are operated as a single integrated enterprise, with the Individual Defendant and Corporate Defendant Stout Hospitality as joint employers. Specifically, the Restaurants are engaged in related activities, share common ownership and have a common business purpose:

- The Restaurants are commonly owned through the common control of Individual Defendant who holds an executive position in all the entities and has the power to make binding decisions for the entities.

- The Restaurants share the same human resources and payroll department. Stout Hospitality operates one (1) careers portal for all of Defendants' locations. *See* **Exhibit B**, snapshot of Stout NYC Hospitality Group's "Careers" page, available at: http://harri.com/stout-nyc-hospitality-group.

- Stout Hospitality's administration of a single integrated enterprise across fifteen (15) active locations is confirmed by Plaintiff's own employment experiences. Throughout Plaintiff's employment, Defendants transferred Plaintiff between several of their locations depending on operational needs: (i) Amity Hall Uptown, (ii) Amity Hall Downtown, and (iii) The Half Pint. These transfers indicate a shared control of labor relations between the Restaurants.

- Stout Hospitality's website lists all fifteen (15) active locations, and one (1) location opening soon. The website contains the following information:

  (i)     "STOUT NYC HOSPITALITY GROUP consists of 16 owner-operated bars/restaurants throughout New York City ". The website lists out all fifteen (15) active locations, and one (1) location opening

soon. *See* **Exhibit C**, snapshot of Stout NYC Hospitality Group's "location" page, available at: https://www.stoutnychospitalitygroup.com/

(ii) All fifteen (15) locations participate in the same events advertised by Stout Hospitality. For instance, Stout Hospitality has launched their Give a Pint, Get a Pint event to provide customers with free drinks "at any of our locations". *See* **Exhibit D**, snapshot of Stout NYC Hospitality Group's "Give a Pint, Get a Pint" page, available at: https://www.stoutnychospitalitygroup.com/pint-for-a-pint.

(iii) Stout Hospitality has a single Facebook, TikTok and Instagram page for all sixteen (16) locations, demonstrating a shared social media platform to advertise all Restaurants and their activities.
   a. Shared Facebook page: https://www.facebook.com/stoutgroup; *see* **Exhibit E**;
   b. Shared Tiktok page: https://www.tiktok.com/@stoutgroup; *see* **Exhibit F**;
   c. Shared Instagram page: https://www.instagram.com/stoutgroup; *see* **Exhibit G**.

(iv) Defendants use the social media pages to share events and advertising to benefit all establishments, such as the advertised NYC bar trail map. *See* **Exhibit H**, snapshot of Stout NYC Hospitality Group's (@stoutgroup) Instagram page.

- The Restaurants all serve similar menu items comprised of a combination of traditional and new American cuisine.

- The Restaurants share common ownership by Individual Defendant, as advertised on his LinkedIn profile. *See* **Exhibit I**, snapshot of Martin Whelan's Linkedin Biography.

- Brendan Donohoe, CEO of Stout Hospitality, published an article titled "*Case Study: How Stout NYC Hospitality Group is Using Technology to Improve Guest Experiences*", which details the advantages of Stout Hospitality using a shared ordering platform, Union, across all Restaurants. *See* **Exhibit J**.

- The New York State Liquor Authority provides a public online tool, the NYS Liquor Authority Mapping Project, to search liquor licenses and other various licenses of businesses in New York, at https://lamp.sla.ny.gov/. These records identify the principal of each business that has an active liquor license. The NYS Liquor Authority identifies Individual Defendant as a principal and liquor licensee for all Restaurants, thereby revealing a common management between the Restaurants by Individual Defendant. *See* **Exhibit K**.

9

- Pursuant to the New York State Liquor Authority Handbook for Retail Liquor Licensees, New York State liquor license holders must (1) prevent sales of liquor to minors, (2) prevent disorder, (3) confine service and consumption of liquor to the licensed area, (4) prevent sales of liquor to visibly intoxicated persons, (5) prohibit their businesses from offering unlimited drink specials, (6) ensure licensed restaurants have suitable kitchen facilities to prepare and serve a full menu whenever their business is open, (7) prevent individuals from appearing nude or partially nude on the licensed premises, (8) prevent the premixing of liquor, (9) prevent the refilling of liquor, (10) prevent possession of untaxed cigarettes & tobacco products, (11) prevent contamination of bottles, (12) maintain adequate books and records of all transactions involving the licensed business, (13) ensure proper identification of all beer taps, (14) ensure compliance with all stipulations  and conditions of the liquor license agreement, (15) comply with all state and local laws and regulations governing the operations of the licensed business. *See* **Exhibit L**. Because Individual Defendant MARTIN WHELAN is the liquor licensee for the Restaurants, Individual Defendant MARTIN WHELAN is required by New York State law to personally ensure the Restaurants comply with the above 15 requirements.

- As the liquor licensee for the Restaurants, Individual Defendant is required by New York State law to (i) personally impose a common management and common control of labor relations upon the Restaurants, and (ii) comply with all state and local laws, including the New York Labor Law, New York State Human Rights Law, and the New York City Human Rights Law. Failure to do so would be in violation of the provisions of the New York State Alcoholic Beverage Control Law which could result in disciplinary action by the New York State Liquor Authority, including arrest or fines. *See* **Exhibit L**; *see also* Chapter 478 of the Laws of 1934.

18.     Although Plaintiff only worked at three (3) locations, all Defendants are still appropriately named in the Complaint as Individual Defendant and Stout Hospitality are joint employers to all employees nominally working for subsidiaries, and are liable through the theory of a "single integrated enterprise." Defendants' Restaurants: (i) engage in related activities; (ii) share common ownership and management by Individual Defendant MARTIN WHELAN, as revealed by his own social media pages and public licenses, (iii) interrelation of operations as shown through the exchange of employees between Restaurants, and (iv) centralized control of labor relations demonstrated by Defendants' shared career page for the hiring of all Restaurants.

19.     Defendants' Restaurants share an adequate amount of commonalities and purposes that clearly classifies them as a "single integrated enterprise".

20.     At all relevant times, each Corporate Defendant has gross annual revenues in excess of $500,000.

21.     At all relevant times, each Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and NYLL.

22.     At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Defendants.

## FLSA COLLECTIVE ALLEGATIONS

23.     Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt front-of-house persons (including servers, bussers, bartenders, food runners, hostesses, and delivery persons, among others) employed by Defendants on or after the date that is six years and 228 days (pursuant to NY's Executive Order tolling during the COVID pandemic) before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

24.     At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiff and FLSA Collective Plaintiffs their proper wages due to invalid deductions of tip credit. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

25.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendant.

## RULE 23 CLASS ALLEGATIONS

26.     Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Prodcure ("F.R.C.P.") Rule 23, on behalf of all non-exempt front-of-house persons (including servers, bussers, bartenders, food runners, hostesses, and delivery persons, among others) and back-of-house persons (including line cooks, prep cooks, and dishwashers, among others) employed by Defendants on or after the date that is six years and 228 days (pursuant to NY's Executive Order tolling during the COVID pandemic) before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

27.     The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23. The Class also includes a subclass of employees, all of whom were non-exempt tipped front-of-house dining-service staff (including servers, bartenders, bussers, and food runners, among others) employed by Defendants (the "Subclass" or "Subclass Members"). Plaintiff is a member of both the Class and the Subclass.

28.     The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class. Further, there is no doubt that there are more than forty (40) members of the Subclass.

29.     Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All Class Members were subjected to the same corporate practices by Defendants, as alleged herein, of Defendants' failure to pay spread of hour premiums and failure to reimburse costs for maintaining and purchasing uniforms. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of Defendants.

30.     Plaintiff and the Subclass suffered from Defendants' failure to pay minimum wages due to Defendants' invalid tip credit policy because Defendants: (i) failed to properly provide Plaintiff and Subclass Members with tip credit notices as required by NYLL § 195 at their dates of hiring and annually thereafter, (ii) deducted tip credits from Plaintiff's and Subclass Members' wages for all hours worked despite having caused them to engage in non-tipped duties for continuous periods of time exceeding thirty (30) minutes every shift, and (iii) deducted tip credits from Plaintiff's and Subclass Members' wages for weeks where the total

amount of non-tip producing work or side work they each performed exceeded 20% or 2 hours of the total work they performed for that week.

31.     Plaintiff is able to fairly and adequately protect the interests of the Class and Subclass and has no interests antagonistic to the Class or Subclass. Additionally, Plaintiff's claims are typical of those claims that could be alleged by any member of the Subclass.

32.     Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

33.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing

incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

34.    Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

35.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a)  Whether Defendants employed Plaintiff and Class Members within the meaning of the New York Labor Law;

b)  What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

c)  At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

d)  Whether Defendants properly notified Plaintiff and Class Members of their hourly rates and overtime rates;

e)  Whether Defendants properly provided notice to Plaintiff and Subclass Members that Defendants were deducting tip credits from their wages;

f)  Whether Defendants provided proper wage statements informing Plaintiff and Subclass Members of the amount of tip credits deducted from their wages for each payment period, their proper overtime rates of compensation, and other information Defendants were required to provide to them on their wage statements, as provided under the New York Labor Law;

g)  Whether Defendant provided proper wage statements to Plaintiff and Class Members per requirements of the NYLL;

h)  Whether Defendants took the proper amounts of tip credit allowance from Plaintiff's and Subclass Members' wages under the New York Labor Law;

i)  Whether Defendants required Plaintiff and Subclass Members to perform non-tipped work for more than 20% of their work day;

j)  Whether Defendants required Plaintiff and Subclass Members to perform non-tipped work for continuous periods of time exceeding 30 minutes;

k)  Whether Defendants paid Plaintiff and Class Members their owed Spread of Hour Premiums as required by NYLL;

l)  Whether Defendant provided to Plaintiff and Class Members proper uniform maintenance expenses in accordance with NYLL; and

m)  Whether Defendants paid Plaintiff and Subclass Members New York State minimum wage for all hours worked.

## STATEMENT OF FACTS

*Plaintiff's Employment Background*

36.     In June 2011, Plaintiff was hired by Defendants as a barback, busboy, and food runner at The Half Pint, located at 76 W 3rd St, New York, NY 10012. In or around 2014, Plaintiff was transferred to Amity Hall Uptown at 982 Amsterdam Avenue. Plaintiff's employment with Defendants ended in or around May 2024.

37.     Plaintiff was scheduled by Defendants to work four (4) days per week. On Wednesdays and Thursdays, Plaintiff worked from 4:00 p.m. to 3:00 a.m., for eleven (11) hours a day and on Saturdays and Sundays, Plaintiff worked from 9:00 a.m. to around 6:00 or 7:00 p.m., for approximately nine (9) to ten (10) hours a day. In total, Plaintiff worked anywhere between forty (40) to forty-two (42) hours a week.

38.     However, Plaintiff's total weekly hours varied based on Defendants' operational needs. In 2021, Plaintiff's Wednesday shift began at 12:00 p.m. and ended at 3:00 a.m. the following day, resulting in a total of fifteen (15) hours worked on Wednesdays. Throughout his employment, Plaintiff was also called in to work an additional day when the Restaurant was short-staffed, had a high volume of reservations, or was hosting a special event or party.

39.     Plaintiff, FLSA Collective Plaintiffs, and Class Members had similar work schedules each week.

40.     Throughout his employment, Plaintiff was paid by Defendants on a weekly basis at the New York State minimum tipped credit hourly rate, for all hours worked. Similarly, FLSA Collective Plaintiffs, and Subclass Members were all compensated at similar rates throughout their employment.

*Invalid Tip Credit Policy Claims*

41.     Throughout their employments, Plaintiff, FLSA Collective Plaintiffs and Subclass Members were subjected to Defendants' invalid tip credit policy, in violation of the FLSA and NYLL.

42.     Throughout Plaintiff's, FLSA Collective Plaintiffs', and Subclass Members' employment, Defendants paid Plaintiff, FLSA Collective Plaintiffs, and Subclass Members at a tip-credit minimum wage. However, Defendants were not actually entitled to deduct any tip credits from Plaintiff's, FLSA Collective Plaintiff's, FLSA Collective Plaintiffs', and Subclass Members' wages under the FLSA and NYLL because Defendants: (i) failed to provide tip credit notice to Plaintiff, FLSA Collective Plaintiffs, and Subclass Members at their hirings, and/or inform them that a tip credit was being deducted, (ii) deducted tip credits from Plaintiff's, FLSA Collective Plaintiffs' and Subclass Members' wages for all hours worked despite having caused them to engage in non-tipped duties for (a) continuous periods of time exceeding thirty (30) minutes, and (b) more than 20% of the work they performed each week.

43.     As a direct result of Defendants' invalid tip credit policy, Plaintiff, FLSA Collective Plaintiffs, and Subclass Members were paid below the New York State minimum wage in violation of the NYLL. *See* 12 N.Y.C.R.R. § 146-1.2, *et seq.*

44.     Throughout Plaintiff's employment, Defendants required Plaintiff to engage in non-tipped duties for a substantial part of his shift. On a daily basis, Plaintiff was required to: (i) clean the basement and dispose of cockroaches and mice, (ii) assemble chairs when they broke, (iii) polish silverware and glassware, (iv) bring up all tables and chairs from the basement, (v) bring the tables and chairs back down to store in the basement again at the end of the shift, (vi) clean the sidewalks, which meant shoveling snow and sprinkling salt to prevent snow accumulation during the winter, (vii) collect and take out the garbage, (viii) clean out the fridge,

and (ix) unload beer crates from the truck and store them in the basement. On a weekly basis, Plaintiff was required to: (i) clear the drainage pipes, and (ii) change the lightbulbs if when they blew out.

45.    All of these tasks would take up two (2) to four (4) hours of every shift that Plaintiff worked. In 2021, Defendants required Plaintiff to start work at 12:00 p.m., and he was exclusively assigned non-tipped work from 12:00 p.m. to 4:00 p.m.

46.    On the days that Plaintiff worked eleven (11) hour shifts, completing 2-4 hours of non-tipped work would take up 18.2% to 36.4% of his shift. On the days that Plaintiff worked nine (9) hour shifts, completing 2-4 hours of non-tipped work amounted to 22.2% to 44.4% of his shift. Because Plaintiff regularly performed non-tipped side work in excess of 20% of his total shift, Defendants' invalidly deducted tip credits from his wages. Similarly, Defendants were not entitled to take FLSA Collective Plaintiffs' and Subclass Members' tip credits, as they required FLSA Collective Plaintiffs and Subclass Members to engage in similar non-tipped side work for similar amounts of time.

47.    Further, Plaintiff, FLSA Collective Plaintiffs, and Subclass Members never received any written or verbal notice from Defendants that Defendants were claiming a tip credit on their weekly compensation. They were never told by Defendants that Defendants were deducting tip credits from their wages nor did they ever receive proper notice by Defendants as to the amount of tip credit allowances Defendants deducted for each payment period during their employments.

*Spread of Hour Premiums Claims*

48.    Defendants underpaid Plaintiff and Class Members due to Defendants' failure to compensate employees for spread of hour premiums.

49.     Throughout his employment, Plaintiff regularly worked eleven (11) hour shifts on on Wednesdays and Thursdays, and in 2021, Plaintiff would even work up to fifteen (15) hours on Wednesdays. Despite many of Plaintiff's and Class Members' workdays lasting in excess of ten (10) hours, Defendants never provided premium payments as demanded by NYLL's Miscellaneous Wage Order pursuant to 12 N.Y.C.R.R. § 142-3.4 *et seq*.

*Uniform Maintenance Expenses Claims*

50.     Defendants would only provide a single uniform to Plaintiff and Class Members. Defendants' policies require that the uniforms be clean when worn; and if the uniforms were deemed as too unpresentable, employees were required to purchase more uniforms from Defendants. Despite paying Plaintiff and Class Members at minimum wage or tip-credit minimum wage, Defendants failed to clean, or offer to clean their employees' uniforms and did not pay uniform maintenance costs. Plaintiff's and Class Members' uniforms were issued by Defendants for the express benefit of Defendants and it was a condition of employment to wear them in a clean condition during each shift. Despite the above, Defendants failed to reimburse any costs for the time cleaning and maintaining the required uniforms as required by NYLL's Miscellaneous Wage Order pursuant to 12 N.Y.C.R.R. § 142-3.5(c).

*WTPA Claims:*

51.     Plaintiff and Class Members never received wage notices accurately stating their base rate of hourly pay from Defendants. They also did not receive wage statements from Defendants accurately stating their base rate of hourly pay and overtime rate.

52.     In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not

providing accurate wage notices, stating employees' true base rate of hourly pay, to Plaintiff and Class Members at the beginning of their employment with Defendants.

53.     Defendants further violated the WTPA by failing to provide Plaintiff and Class members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

54.     In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As many Courts have observed, when paired with allegations of underpayments, the harm generated from the failure to provide such accurate notices and statements, is obvious on its face:

> Denying an employee such notices—as alleged here—can impinge on an employee's interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay. The Court thus finds that, by alleging that they were not furnished the statutorily required notices, plaintiffs have asserted a concrete and particularized injury sufficient to confer standing for their WTPA wage notice and wage statement claims. Consistent with this, multiple courts in this District have exercised jurisdiction over such claims, without requiring a specific showing as to the downstream impact on the plaintiff of the non-provision of the required notice.

*Bueno v.Buzinover*, 2023 U.S. Dist. LEXIS 38154, *5-6 (S.D.N.Y. 2023) (Judge Paul A. Engelmayer) (collecting cases)

> The wage statement and notice violations alleged here are of a different class of harm than those alleged in *TransUnion* and *Maddox*. The WTPA was enacted to "protect an employee's concrete interest in being paid what he or she is owed under the NYLL." *Bueno*, 2023 U.S. Dist. LEXIS 38154, 2023 WL 2387113, at *3 (quoting *Imbarrato v. Banta Mgmt. Servs. Inc.*, No. 18 CV 5422, 2020 U.S. Dist. LEXIS 49740, 2020 WL 1330744, at *8 (S.D.N.Y. Mar. 20, 2020)). Specifically, the WTPA's wage notice and wage statement provisions are intended to serve as safeguards of employees' broader interest in being paid the wage they are owed. *Bueno*, 2023 U.S. Dist. LEXIS 38154, 2023 WL 2387113, at *3.

> Here, although the plaintiffs' wage statement and notice claims allege only the bare assertion that they never received their statutorily required wage statements and notices, the realization of the downstream harm the statute seeks to prevent— wage theft—is evident on the face of the pleadings. Had the sole allegation been one of failure to furnish statutorily mandated notices and statements absent the companion allegations of wage theft, plaintiffs may have encountered an issue of standing. But that is not the case here. The plaintiffs in this case allege a years-long practice of failing to pay proper wages, a pattern that was undoubtedly buttressed by their employer's failure to comply with the wage statement and notice provisions of the WTPA, which were designed to prevent this precise form of wage theft by informing employees of their pay rates and deductions.

*Bello v. Pro-Line Pumping Corp.*, 2023 U.S. Dist. LEXIS 106676, *27-29 (E.D.N.Y. 2023) (Judge Robert Levy); *report and recommendation adopted, Bello v. Pro-Line Pumping Corp.*, 2023 U.S. Dist. LEXIS 125632 (E.D.N.Y. 2023) (Judge Rachel P. Kovner).

55.    Other Courts have found standing exists where a plaintiff alleges that the failure to provide proper wage notices and statements resulted in one of the following: (i) delayed payment of all proper wages, (ii) deprived employees of the ability to immediately contest wage calculations, (iii) misled and/or confused employees as to their hours worked or rates of pay, and/or (iv) the inaccurate or absent wage notice and wage statements prevented employees from realizing the extent of their underpayments. *See e.g., Lipstein v. 20X Hospitality LLC*, 2023 WL 6124048, at *9 (S.D.N.Y. Sept. 19, 2023) (Judge Jennifer L. Rochon) (finding standing where plaintiff alleged that the lack of wage notices and wage statements kept him from realizing that

he was being underpaid and thereby preventing him from taking appropriate action to obtain the payments due to him); *Metcalf v. TransPerfect Translations International, Inc.*, 2023 WL 2674743, at *6 (S.D.N.Y. Mar. 29, 2023) (Judge Edgardo Ramos) (finding standing where plaintiffs alleged that inaccurate wage notices and wage statements prevented them from knowing whether, and to what extent, they had been underpaid).

56.     Here, as in the cases described above, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay including overtime hours and overtime rates due to the wage violations described above, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, necessitated the current litigation to vindicate Plaintiff's and Class Members' rights, and delayed Plaintiff's and Class Members' retention of complete compensation. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

57.     Had the wage statements Defendants provided to Plaintiff and Class Members accurately listed the correct base rate of pay Plaintiff and Class Members actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the proper rates that Plaintiff and Class members were entitled to, or (b) forthrightly acknowledge, by way of the wage statement, that the employees' wages did *not* correspond to the proper rates to which employees were entitled. Either possibility would have allowed Plaintiff and Class members to immediately vindicate their rights under the NYLL. The deprivation of these

possibilities therefore constitutes an injury as does the delay in receiving payment caused by them.

58.    The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

59.    Further, the failure to accurately record hours of work on earnings statements, which Defendants are mandated by law to undertake on behalf of Plaintiff and Class Members, dissuaded reasonable workers, including Plaintiff, from raising complaints and advocating for their rights.

60.    Due to Defendants' failure to provide legally mandated notices such as earning statements and wage notices, Defendants were able to hide its wrongdoing from employees, dissuaded reasonable workers from bringing claims ending Defendants' underpayment of wages sooner, and Defendants continue to attempt to hide its wrongdoing necessitating the current litigation. The failure to provide NYLL notices delayed Plaintiff's and Class Members' realization of underpayments and their extent, which in turn delayed the bringing of the current litigation, and delayed payment of all proper wages owed to Plaintiff and Class Members.

61.    Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements, as required by the NYLL.

62.    The direct effect of understating the number of hours an employee worked is to reduce the wages that the employee is listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee's earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5

(Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is \$130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned \$ 133,086 as reflected on his final year paystub and W-2").

63.     The effect of reporting reduced wages on an employee's W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co*., 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

64.     "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting

*Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

65.     Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury from both the delay in recouping payment, and in lost benefits. Had the number of hours been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

66.     Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id.* at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id.* Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id.* "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id.*

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

67.     The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and Class Members, rather than merely misreporting their incomes. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id.*

Plaintiff and Class Members lost benefits by virtue of how Defendants reported their incomes, and how Defendants reported employees' incomes was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

68.    Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id.* ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

69.    The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

70.    Here, the problem is not merely challenging but insurmountable. Plaintiff and Class members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the

total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was irreversibly injured

with respect to their social security benefits as soon as Defendants sent their W-2's to the IRS.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. §

413(a)(2)(A)(ii)).

71.    At all relevant times, Defendants knowingly and willfully operated their business

with a policy of deducting invalid tip credits from Plaintiff's, FLSA Collective Plaintiff's and

Subclass Members' wages, in violation of the FLSA and NYLL.

72.    At all relevant times, Defendants knowingly and willfully implemented a policy

which failed to reimburse Plaintiff and Class Members their costs for purchasing or maintaining

uniforms, as required under the NYLL.

73.    At all relevant times, Defendants knowingly and willfully failed to pay any spread

of hour premiums despite scheduling Plaintiff and Class Members to work a spread in excess of

ten (10) hours.

74.    Plaintiff retained Lee Litigation Group, PLLC, to represent Plaintiff, FLSA

Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a

reasonable fee for its services.

### STATEMENT OF CLAIM

### COUNT I

### VIOLATION OF THE FAIR LABOR STANDARDS ACT

75.    Plaintiff realleges and incorporates all the above allegations of this Complaint as

fully set forth herein.

76.    At all relevant times, Defendants were and continue to be employers engaged in

interstate commerce and/or the production of goods for commerce within the meaning of the

FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

77.    At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

78.    At all relevant times, Corporate Defendants had gross annual revenues in excess of $500,000.

79.    At all relevant times, Defendants had a policy and practice that failed to pay proper wages to Plaintiff and FLSA Collective Plaintiffs, due to an invalid tip credit.

80.    Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

81.    Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

82.    As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

83.    Due to the intentional, willful, and unlawful acts of Defendants, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid wages and overtime due to an invalid tip credit, plus an equal amount as liquidated damages.

84.    Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

85.    Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

86.    At all relevant times, Plaintiff and Class Members were employed by the Defendants within the meaning of the New York Labor Law, §§2 and 651.

87.    At all relevant times, Defendants had a policy and practice of failing to pay Plaintiffs and Class Members due to Defendants' failure to compensate employees for spread of hours premiums and uniform expenses pursuant to NYLL's Miscellaneous Wage Order 12 N.Y.C.R.R. § 142-3.4 and § 142-3.5(c).

88.    Defendants failed to properly notify employees of their hourly pay rate and overtime rate, in direct violation of the New York Labor Law.

89.    Defendants willfully violated Plaintiff's and Subclass members' rights by failing to pay them the lawful minimum wage for all hours worked. As factually described above, Defendants were not entitled to claim any tip credits from Plaintiff's and Subclass members' wages under the NYLL.

90.    Defendants willfully violated Plaintiff's and Subclass members' rights by subjecting them to an improper policy and practice in which they were required to engage in non-tipped work for: (i) continuous periods of time exceeding 30 minutes; or (ii) more than 2 hours or 20% of each of their workweeks.

91.    Defendants failed to provide Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law.

92.     Defendants failed to provide Plaintiff and Class Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

93.     Due to the Defendants' New York Labor Law violations, Plaintiff and Class Members are entitled to recover from Defendants their unpaid minimum wages, due to improper tip credit, unpaid spread of hours premiums, unreimbursed costs for maintenance and purchase of uniforms, reasonable attorneys' fees, liquidated damages, statutory penalties, and costs and disbursements of this action, pursuant to New York Labor Law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class Members, respectfully requests that this Court grant the following relief:

a.     A declaratory judgment that the practices complained of herein are unlawful under the FLSA and NYLL;

b.     An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.     An award of unpaid wages, including overtime, due to an invalid tip credit policy, due under the FLSA and NYLL;

d.     An award of premiums and unreimbursed costs as a result of Defendants' failure to compensate spread of hour premiums and uniform expenses, due under the NYLL;

e.     An award of statutory penalties, prejudgment and post judgment interest, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties;

f.      Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

g.      Designation of this action as a class action pursuant to F.R.C.P. 23;

h.      Designation of Plaintiff as Representative of the Class;

i.      Designation of Plaintiff as Representative of the Subclass; and

j.      Such other and further relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: May 8, 2025

Respectfully submitted,

By:    */s/ C.K. Lee*_____
C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
148 West 24th Street, Second Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff, FLSA Collective*
*Plaintiffs and the Class*
